(No. 12255.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* STEPHEN POPOVICH, Plaintiff in Error.

*Opinion filed December 18, 1918—Rehearing denied Feb. 12, 1919.*

1. CRIMINAL LAW—*what does not justify shooting in self-defense.* Testimony by the defendant that the deceased was drinking in a saloon and offering to fight anyone and that he was "looking mean" at the defendant does not justify the latter's act in getting a revolver and going out of the side door of the saloon and shooting the deceased as the latter, with a companion, was leaving by the front door, even though he also testifies that when he met the deceased at the front door the latter had something shiny in his hand, which the defendant thought at the time was a knife.

2. SAME—*practice of offering large number of instructions in simple case is to be condemned.* Where the trial of a criminal case is finished the day after it is begun, the record is small and the principles of law involved are few, the offering of eighty-seven instructions is not justifiable, as it places an unreasonable and unnecessary burden on the trial court and tends to confuse rather than aid the jury.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. JOHN P. McGOORTY, Judge, presiding.

CRUICE & LANGILLE, (DANIEL L. CRUICE, of counsel,) for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

The plaintiff in error was indicted for the killing of Mike Ljiljak and was found guilty of manslaughter, in the criminal court of Cook county. Motions for new trial and in arrest of judgment were overruled and judgment on the verdict entered. The defendant now brings the cause of action to this court by writ of error.

Errors assigned and argued by plaintiff in error are that the verdict is against the evidence and that the trial court erred in the giving and refusing of instructions.

The killing occurred at or near a saloon and boarding house conducted by Nick Adamnovich fronting on One Hundred and Eighth street, in the city of Chicago. There was a front entrance on the northeast corner, consisting of an outer and inner door, which, when closed, made a small room or vestibule. There was also an east door opening on Burley avenue. To the south and southwest of the saloon, in the direction of the railroad tracks of the Pennsylvania Railroad Company, was open country, called the prairie. On the evening of December 25, 1918, the deceased, Mike Ljiljak, plaintiff in error and several others had congregated in this saloon and were engaged in drinking and playing cards and pool. These parties remained in the saloon until toward midnight, when plaintiff in error left the saloon by a side door shortly after the deceased and Pete Kasich had left by way of the front door, where they and plaintiff in error met. In the altercation that ensued two shots were fired. Plaintiff in error ran towards the prairie, followed by the deceased and Kasich for a short distance, when the deceased sank to the ground and died.

Plaintiff in error in his testimony of what occurred stated that during the evening he and Ramen Rakich had played pool and cards for beer; that during this time the deceased and others were singing like fools and using profane language; that the deceased, while drinking, would "look mean" at plaintiff in error; that the deceased stepped out a few feet from the bar and said, "Anybody in this house wants to fight me, come across; I ain't scared of them,—anyone of them in this saloon here;" that he looked at the plaintiff in error and said, "What do you say, Steve? If you want to fight I am ready;" that plaintiff in error each time said, "No, thank you," and other words tending to calm the passions of deceased. In this plaintiff in error

is not corroborated.  Others in the saloon during this time testified that they did not hear any remarks of this character made by the deceased.  The plaintiff in error further testified that he went to the dining room in the back of the saloon building and secured a revolver which had been placed there by him a few days before and then came back into the bar-room and with Rakich stepped to the bar for another drink at the expense of the plaintiff in error; that the deceased again asked if anybody wanted to fight, addressing his remark apparently to plaintiff in error; that the deceased soon after went out at the door fronting on One Hundred and Eighth street, and that as he disappeared he turned his face back and looked in a threatening manner at the plaintiff in error; that the deceased was immediately followed by Pete Kasich; that he (plaintiff in error) went out of the side door soon after; that he went out through a fence to a water closet outside, in a barn; that he then came back along the side of the building and looked through a window into the room recently left by all three; that he saw no one in there but Rakich; that he then went to the front door, and that on opening this door he encountered the deceased, behind whom was Kasich, coming through the inner door leading from the bar-room to the vestibule.  He testifies that the deceased jumped at him and held something in his hand shining like a knife, which plaintiff in error says he took to be a screw driver, because about two weeks before he had seen in this same saloon a screw driver drop out of the pocket of the deceased; that the deceased hit the plaintiff in error in the chest; that Kasich closed the door behind him, after which the vestibule was dark; that plaintiff in error was scared; that he fired two shots to scare the deceased and struck him on the head with the side of the revolver; that the gun dropped out of his hands, after which he ran; that when he was about 30 feet away he looked back and saw the deceased and Kasich running after

him; that he ran to the southwest of the saloon, toward the Pennsylvania railroad tracks, into the prairie.

The body of the deceased was found in the prairie, about 180 feet south of One Hundred and Eighth street and about 300 feet west of Burley avenue. On the forehead, above the right eye, were powder marks and abrasions, and contusions were found on the opposite side of the face. The body contained, besides the above, one bullet wound, which penetrated the body near the heart. The bullet removed from this wound in the body was 38-caliber. The revolver was picked up the next morning within 25 feet of the place where the body was found. It was 38-caliber and is admitted to be the one used by the plaintiff in error.

There is some conflict in the evidence as to when and where the second shot was fired. The plaintiff in error and Pete Kasich testified that both shots were fired while the parties were at or in the vestibule and that one immediately followed the other. Nick Adamnovich, the owner of the saloon, testified that he heard two shots soon after the parties left the saloon,—the first at or in the vestibule and the second a few minutes later to the southwest of the saloon, toward the prairie. Dan Studen testified that he heard only one shot fired, and could not tell whether it was fired inside or outside of the building. No one testified to having heard three shots. Kasich testified that he and the deceased had entered the vestibule entrance to the saloon on their way out; that he had followed the deceased; that as he closed the door between the vestibule and the saloon the deceased opened the outside door leading toward Burley street and started out; that he (Kasich) had started out at the other outside door leading from the vestibule to One Hundred and Eighth street toward his home, when he saw the plaintiff in error fire two shots at the deceased at close range; that plaintiff in error then ran out toward the prairie, the deceased following him; that he (Kasich) did not know deceased was shot until he fell; that he heard but two shots.

Dr. Hatton, the coroner's physician, testified that the conditions found by him on the post-mortem examination of the deceased were that the bullet, after entering the body near the heart, had punctured the left branch of the pulmonary artery and other blood vessels, causing shock and hemorrhage, from which the deceased had died; that there would be a gradual loss of consciousness and a gradual loss of powers of locomotion; that the time from receiving the wound until death would vary from forty seconds to two minutes; that there was no connection between the powder burns and the wound near the heart.

It is urged by the plaintiff in error that a third shot was fired by someone other than himself, and that the evidence tends to show that such third shot was the one that caused the mortal wound in question, or, at least, that such evidence was sufficient to raise in the minds of the jury a well founded doubt as to the plaintiff in error having fired the shot that caused the mortal wound. There is no testimony by any witness to the effect that there were three shots. No witness testified to having heard more than two shots, which number plaintiff in error admits firing. One shot was evidently fired at close range, as there were powder burns on the face of the deceased. The other shot was fired at such distance that there was no evidence of powder burns. The evidence shows that neither the deceased nor Kasich had a revolver. Kasich was behind the deceased while he and the deceased were leaving the saloon and likewise when they were following the plaintiff in error. The deceased was shot by someone in front of him. There is no evidence of anyone other than these three being in the immediate vicinity of the shooting. The jury were justified in concluding that the plaintiff in error was the one who fired the shot causing the death of the deceased.

Plaintiff in error contends that if the fatal shot was fired by him it was in self-defense, and that when attacked by the deceased in the doorway he was justified in taking his

life. There is a variance in the testimony as to threats be-
ing made by the deceased while drinking in the saloon. The
witness Adamnovich testified that the deceased made no
threats, and the witness Studen testified that he did not hear
deceased make any threats, while plaintiff in error testifies
to such threats, as herein noted. Assuming that the de-
ceased made the statements attributed to him by plaintiff
in error, they were not of themselves sufficient provoca-
tion to warrant the killing in self-defense. Plaintiff in er-
ror boarded and slept in that building. After these alleged
statements, according to his own testimony, he left the bar-
room and secured the revolver in question and returned
there, where he indulged in further drinking. Soon after
the deceased and Kasich left the bar-room by way of the
front door the plaintiff in error departed by way of the
side door, and according to his statement was at the front
door and met the deceased and Kasich as they left the build-
ing. He testifies that the deceased flashed something which
plaintiff in error took to be a knife or a screw driver; that
the deceased struck him on the chest, and that he (plaintiff
in error) shot twice and struck the deceased with the revol-
ver and ran. He does not explain his presence at the front
door when deceased was leaving the building. The jury
were justified in believing that up to that point he, and not
the deceased, was the aggressor. He was in the street while
the deceased was coming through the door and might have
avoided an encounter had he chosen to do so. There were
no circumstances, as we view the record, that would justify
taking the life of the deceased.

Plaintiff in error also contends that the court erred in
the giving and refusing of certain instructions. There were
offered in all in this case eighty-seven instructions. The
case was started on March 7 and finished on the following
day. The record is small. The principles of law involved
are few. The practice of offering an unreasonable and un-
necessary number of instructions is to be condemned, as

tending to confuse the jury rather than to instruct them, while it places an unreasonable and unnecessary burden on the trial court. We have, however, examined the instructions complained of, together with all instructions given, and are of the opinion that the jury were fully and fairly instructed.

We find no reversible error in the record, and the evidence clearly sustains the verdict of the jury.

The judgment of the criminal court will be affirmed.

*Judgment affirmed.*